**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **CATLIN SPECIALTY INSURANCE CO.,** | : | |
| | : | **CIVIL ACTION** |
| *Plaintiff/Counterdefendant*, | : | |
| **v.** | : | |
| | : | |
| **J.J. WHITE, INC.,** | : | **No. 14-1255** |
| | : | |
| *Defendant/Counterplaintiff*, | : | |
| | : | |
| **SUNOCO, INC., et al.,** | : | |
| | : | |
| *Counterplaintiffs*. | : | |

_____

**Goldberg, J.**                                                                 **February 26, 2018**

<u>**MEMORANDUM OPINION**</u>

This insurance coverage case stems from a settled state court wrongful death lawsuit wherein it was alleged that exposure to harmful chemicals at Sunoco refineries caused the death of a refinery worker. Plaintiff in the case before me, Catlin Specialty Insurance Company ("Catlin"), seeks a judicial declaration that the insurance policy it issued to Defendant, J.J. White, Inc. ("J.J. White"), does not cover losses from this lawsuit, which was brought by the estate of a J.J. White employee. J.J. White—and purported additional insureds that have intervened in this action, Sunoco, Inc. and Sunoco, Inc. (R&M) (collectively, "Sunoco")—have asserted counterclaims against Catlin, arguing that Catlin breached its duty to defend them in the underlying lawsuit, and seek reimbursement for the amount that J.J. White and Sunoco paid to settle that case.

Currently before me are two cross-motions for summary judgment: (1) Catlin's "Motion for Summary Judgment;" and (2) J.J. White and Sunoco's "Amended Motion for Summary Judgment or, Alternatively, Partial Summary Judgment." For the reasons that follow, Catlin's

Motion will be denied and J.J. White and Sunoco's Motion will be granted in part and denied in part.

## I.    **FACTUAL & PROCEDURAL BACKGROUND**

The following facts are undisputed, unless otherwise noted: At all times relevant to this matter, J.J. White provided maintenance services for refineries, including maintaining and replacing pipes within such refineries. J.J. White's clients included Sunoco, which operated refineries in and around Philadelphia. J.J. White provided its services to Sunoco as a general contractor under a series of agreements referred to as the "Field Services Contracts." Under the Field Services Contracts, J.J. White was required to maintain certain insurance policies and name Sunoco as an additional insured on those policies.[1] (J.J. White/Sunoco's SOF ¶¶ 7-9, 39, 48-49; Decl. of Robert Celestino (hereinafter "Celestino Decl."), Ex. F., Doc. No. 108-11 at 24; Catlin's Resp. to J.J. White/Sunoco's SOF ¶¶ 7-9, 39, 48-49.)

### A. *The Pollution Policy Catlin Issued to J.J. White*

J.J. White first obtained the insurance policy at issue in this case from Catlin in 2009, which was entitled "Contractor's Protective Professional and Pollution Legal Liability Insurance Policy" (hereinafter the "Pollution Policy"). By the time the claim at issue in this case was made, in 2012, the Pollution Policy had been renewed twice.[2] (J.J. White/Sunoco's SOF ¶ 10; Catlin's Resp. to J.J. White/Sunoco's SOF ¶ 10.)

While the Pollution Policy has three coverage parts—A, B, and C—only one, Coverage C (entitled "Pollution Legal Liability"), is at issue. Coverage C provides, in relevant part:

---

[1] As will be discussed below, the parties dispute which specific types of insurance coverage J.J. White was required to obtain under the Field Services Contracts.

[2] At the time the claim was made, the Pollution Policy had an effective period of June 1, 2011, through June 1, 2012.

> **The Insurer** shall pay on behalf of **Insured** for a **Pollution Loss** . . . which the **Insured** has or will become legally obligated to pay as a result a [sic, read "as a result of a"] **Pollution Claim** first made against the Insured and reported to the Insurer, in writing, during the **Policy Period** . . . from **Pollution Conditions** . . . , provided that . . . the **Pollution Conditions** first occurred on or after the **Retroactive Date** . . . .[3]

The Pollution Policy defines the term "Pollution Condition" (singular) as: "the discharge, dispersal, release, seepage, migration or escape of smoke, soot, fumes, acids, alkalis, toxic chemicals, asbestos, liquids or gases, waste materials or other irritants, contaminants or pollutants . . . into or upon land, the atmosphere or any watercourse or body of water." (Decl. of Matthew J. Ford (hereinafter "Ford Decl."), Ex. A (hereinafter "Pollution Policy") §§ I, IV.Q.)

As the language above indicates, the Pollution Policy is a "claims-made" policy, as opposed to an "occurrence-based" policy. That is, the Pollution Policy provides coverage for a certain claim based on the date that the claim was made against the insured, rather than the date on which the event that gave rise to the claim occurred. However, like many claims-made insurance policies, the Pollution Policy has an occurrence-based proviso to its coverage—a "retroactive date." (This provision is referred to hereinafter as the "Retroactive Date Provision.") As set out above, the Retroactive Date Provision provides that even if a claim is "made . . . during the Policy Period," there is only coverage if "the Pollution Conditions first occurred on or after the Retroactive Date." The Pollution Policy specifies a retroactive date of April 30, 2002. (J.J. White/Sunoco's SOF ¶¶ 10, 25, 34; Catlin's Resp. to J.J. White/Sunoco's SOF ¶¶ 10, 25, 34.)

While the Pollution Policy names J.J. White as the "Named Insured," it provides that Coverage C will also cover, as an additional insured, "any client of [J.J. White] that [J.J. White] has agreed by written contract to name as an additional insured on this Policy, but solely as

---

[3] The bolding is in the original text of the Pollution Policy and signifies terms that are defined therein.

respects otherwise covered Pollution Losses caused by [J.J. White's] Contractor Activity." (J.J. White/Sunoco's SOF ¶ 19; Catlin's Resp. to J.J. White/Sunoco's SOF ¶ 19.)

## B. *The Underlying Lawsuit*

George Gans was a longtime employee of J.J. White who worked as a contractor in Sunoco's refineries—beginning as early as 1986 and continuing through 2010. In 2010, Gans was diagnosed with Acute Myelogenous Leukemia, and died of this condition shortly thereafter. (J.J. White/Sunoco's SOF ¶ 40; Catlin's Resp. to J.J. White/Sunoco's SOF ¶ 40; Catlin SOF ¶ 12; J.J. White/Sunoco's Resp. to Catlin's SOF ¶ 12; Ford Decl., Ex. C ¶¶ 7-8, 27.)

In October 2011, Gans' estate brought suit against Sunoco, alleging that his leukemia was caused by exposure to benzene and other hydrocarbons (collectively, "BTEX") while working in Sunoco's refineries, and that Sunoco had failed to take adequate steps to protect Gans from this hazard. (The suit is referred to hereinafter as the "Gans Suit.") Importantly, the complaint in the Gans Suit did not allege on what dates, exactly, Gans was exposed to BTEX, but only that Gans was exposed before May 1, 2010. (Catlin's SOF ¶ 7; J.J. White/Sunoco's Resp. to Catlin's SOF ¶ 7; J.J. White/Sunoco's SOF ¶ 37; Catlin's Resp. to J.J. White/Sunoco's SOF ¶ 37.)

In March 2012, Sunoco informed J.J. White of the Gans Suit, requesting that J.J. White defend and indemnity it, pursuant to the Field Services Contracts. In turn, J.J. White informed Catlin of the Gans Suit, advising that Sunoco was seeking coverage as an additional insured under the Pollution Policy. Thereafter, in September 2012, Sunoco made J.J. White a party to the Gans Suit, filing a third-party complaint against it for indemnification. (Catlin's SOF ¶ 9, J.J. White/Sunoco's Resp. to Catlin's SOF ¶ 9; J.J. White/Sunoco's SOF ¶¶ 41, 45; Catlin's Resp. to J.J. White/Sunoco's SOF ¶¶ 41, 45.)

Catlin agreed to defend J.J. White subject to a reservation of rights, informing J.J. White that it would not be covered for the Gans Suit if "there was chemical exposure to [Gans] that pre-dates the Retroactive Date," April 30, 2002. Catlin did not agree to defend Sunoco, which retained and paid for its own counsel. (Catlin's SOF ¶ 10; J.J. White/Sunoco's Resp. to Catlin's SOF ¶10; J.J. White/Sunoco's SOF ¶¶ 46-47, 67, 72; Catlin's Resp. to J.J. White/Sunoco's SOF ¶¶ 46-47, 67, 72.)

Meanwhile, discovery proceeded in the Gans Suit. By October 2013, both Gans' estate and Sunoco had produced expert reports. These reports disagreed as to the cause of Gans' leukemia. While the estate's experts opined that Gans' years of exposure to BTEX had likely caused him to develop leukemia, defense experts disagreed, contending that Gans' leukemia was more likely "idiopathic" (i.e., of indeterminate cause) or the result of Gans' years of cigarette smoking and family history of cancer. (J.J. White/Sunoco's SOF ¶¶ 75, 77-79, 81-85; Catlin's Resp. to J.J. White/Sunoco's SOF ¶¶ 75, 77-79, 81-85.)

In early 2014, three of Gans' coworkers were deposed—John Keegan, Thomas Tyrrell, and Charles Burns. While J.J. White and Sunoco dispute the reliability of this deposition testimony, Keegan, Tyrell, and Burns testified generally that in the late 1980s, 1990s, and early 2000s Gans was exposed to liquids and gasses that—they believed—contained BTEX. (Catlin's SOF ¶¶ 11-12, 14-15; J.J. White/Sunoco's Resp. to Catlin's SOF ¶¶ 11-12, 14-15).

Thereafter, on February 27, 2014, Catlin filed this action seeking a declaration that the Pollution Policy does not provide coverage for the Gans Suit. The following day, Catlin sent a letter to J.J. White disclaiming coverage for, and withdrawing its defense of, the Gans Suit, explaining its position that Keegan's deposition testimony established that Gans had been exposed to BTEX before the Pollution Policy's April 30, 2002, retroactive date. (Catlin's SOF ¶

16; J.J. White/Sunoco's Resp. to Catlin's SOF ¶ 16; J.J White/Sunoco's SOF ¶¶ 103-104; Catlin's Resp. to J.J White/Sunoco's SOF ¶¶ 103-104.)

Less than a week after Catlin disclaimed coverage, J.J. White and Sunoco reached a settlement with Gans' estate. J.J. White and Sunoco agreed to settle for $3.5 million—of which $2.5 million was to be paid by Sunoco and $1 million was to be paid by J.J. White. (J.J. White/Sunoco's SOF ¶¶ 105-106, 110; Catlin's Resp. to J.J. White/Sunoco's SOF ¶¶ 105-106, 110; Decl. of James J. Black, III, Esq. ("Black Decl."), Ex. C, Doc. No. 108-23 at 27.)

### C. *The Cross-Motions for Summary Judgment*

After Catlin brought this declaratory judgment action, seeking a declaration that there is no coverage for the Gans Suit, J.J. White counterclaimed, alleging that Catlin breached its duty to defend. Sunoco intervened, alleging that it is an additional insured under the Pollution Policy and that it too was entitled to a defense from Catlin.

The parties have now cross-moved for summary judgment. Catlin contends that it is entitled to a declaration that there is no coverage for the Gans Suit, because the record in that suit established beyond genuine dispute that Gans was first exposed to BTEX before the Pollution Policy's Retroactive Date, April 30, 2002.

In their own Motion for Summary Judgment, J.J. White and Sunoco contend that, as a matter of law, Catlin breached its duty to defend by withdrawing its defense of the Gans Suit while the cause of Gans' leukemia was still in dispute. J.J. White and Sunoco further contend that, because Catlin breached its duty to defend, Catlin must indemnify them for the $3.5 million settlement they subsequently agreed to pay to settle the Gans Suit. Alternatively, J.J. White and Sunoco seek partial summary judgment on their position that the Retroactive Date Provision is an "exclusion" to coverage, the applicability of which Catlin, as the insurer, bears the burden of proof.

And finally, Sunoco contends that it is entitled to summary judgment on its claim that it is an additional insured on the Pollution Policy—and therefore also entitled to defense and indemnity from Catlin—based on the provision of the Pollution Policy that provides coverage to any entity that J.J. White agrees, by written contract, to name as an additional insured.

For the reasons that follow, I conclude that Catlin is not entitled to summary judgment on its declaratory judgment claim that the Pollution Policy does not cover the Gans Suit. I further find, as a matter of law, that Catlin breached its duty to defend the Gans Suit by withdrawing its defense and disclaiming coverage. However, I conclude that this breach does not, in itself, establish that Catlin is required to indemnify J.J. White and Sunoco for the amount that they paid to settle the Gans Suit. I further conclude that the Pollution Policy's Retroactive Date Provision is not an "exclusion" to the Pollution Policy, but part of the initial grant of coverage, as to which J.J. White and Sunoco, as insureds, bear the burden of proof. And finally, I conclude that Sunoco is an additional insured under the Pollution Policy.

## II.      <u>LEGAL STANDARD</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact in dispute, and that judgment is appropriate as a matter of law. <u>Id.</u>; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). However, once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

An issue is "genuine" if a reasonable jury could rule in favor of the non-moving party based on the evidence presented. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). A factual dispute is "material" if it might affect the outcome of the suit under the appropriate governing law. Id. at 423. The non-moving party cannot avert summary judgment with speculation or conclusory allegations, but rather must cite to the record. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court considers the evidence in the light most favorable to the non-moving party. Anderson, 477 U.S. at 256.

"The rule is no different where there are cross-motions for summary judgment," because such cross-motions are "no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." Lawrence v. City of Phila., Pa., 527 F.3d 299, 310 (3d Cir. 2008) (internal quotation marks omitted). Accordingly, while I will discuss together the overlapping issues raised by the parties' cross-motions for summary judgment, I will bear in mind each party's burden on summary judgment.

### III.   ANALYSIS

#### A.   *Choice of Law*

The parties first dispute which state's law applies to the substantive issues raised—New York's or Pennsylvania's. The Pollution Policy contains a choice of law clause, which provides as follows:

**Choice of Law and Jurisdiction**

The policy shall be subject interpretation [sic, read "subject to interpretation"] under the law of the State of New York.

(Pollution Policy, § XI.L.)

Citing this clause, Catlin argues that New York law applies. J.J. White and Sunoco argue that Pennsylvania law applies, because there is no conflict between Pennsylvania and New York law as to the only issue within the clause's scope—the "interpretation" of the Pollution Policy. J.J. White and Sunoco contend that the other issues to be decided—the consequences of a breach of the duty to defend, and whether the Retroactive Date Provision is an exclusion—fall outside the scope of the choice of law clause, which applies only to the "interpretation" of the Pollution Policy. Alternatively, J.J. White and Sunoco argue that the choice of law clause should be disregarded as invalid.

A federal court in Pennsylvania exercising diversity jurisdiction must apply Pennsylvania choice of law rules to decide which state's law applies, including its rules for determining whether a choice of law clause is valid. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941); Lipman Bros., Inc. v. Apprise Software, Inc., No. 13-cv-4439, 2015 WL 4476983, at *6 (E.D. Pa. July 22, 2015) (noting that a federal court in Pennsylvania "applies Pennsylvania choice of law rules, including Pennsylvania's inclination to enforce choice of law clauses"). Under those rules, the first step is to determine whether the parties have, by agreement, chosen the governing law. See Assicurazioni Generali, SPA v. Clover, 195 F.3d 161, 164 (3d Cir. 1999) (holding that "Pennsylvania law . . . provide[s] that the first question to be answered in a potential conflict of laws issue is whether the parties explicitly or implicitly have chosen the relevant law"); Atlantic Pier Assocs., LLC v. Boardakan Rest. Partners, 647 F. Supp. 2d 474, 486-87 (E.D. Pa. 2009) (noting that, under Pennsylvania choice of law rules, a court need only

determine if there is a conflict between the laws of the different states "[i]f the parties have not agreed upon a choice of law"). Accordingly, I need not determine whether there is a conflict between New York and Pennsylvania law provided that: (1) the choice of law clause is valid; and (2) the issues to be decided fall within the clause's scope. While the choice of law answer seems self-evident, both points are disputed here.

### 1. Validity of the Choice of Law Clause

J.J. White and Sunoco argue that, under Pennsylvania law, the choice of law clause in the Pollution Policy is invalid because: (1) such clauses are ineffective in insurance contracts, where the chosen law gives an insured less protection than the otherwise applicable law; and (2) the parties and the Pollution Policy bear no substantial relationship to the state chosen, New York. I disagree with both arguments and hold that the choice of law clause is valid.

As Catlin notes, Pennsylvania courts have enforced choice of law clauses in insurance policies without regard to whether the chosen law provides more or less protection for an insured. See, e.g., Smith v. Lincoln Benefit Life Co., No. 08-cv-1324, 2009 WL 789900, at *7 (W.D. Pa. March 23, 2009) (collecting cases). In arguing to the contrary, J.J. White and Sunoco cite only a comment from the Restatement (Second) of Conflict of Laws providing that "effect will frequently not be given to a choice-of-law provision in a contract of fire, surety or casualty insurance which designates a state whose local law gives the insured less protection than he would receive under the otherwise applicable law." Restatement (Second) of Conflict of Laws (cited hereinafter as "Restatement") § 193 cmt.e (1971). However, J.J. White and Sunoco cite no cases from Pennsylvania courts following the trend suggested by this comment.[4]

---

[4] Nor do J.J. White and Sunoco explain why the exception to this trend contained in the comment—noting that "[e]ffect is more likely to be given [to a choice of law clause] . . . in a situation where the insured enjoys a relatively strong bargaining position"—does not apply here, given that J.J. White is not an individual insured with little bargaining power or knowledge of insurance policies and the laws that

Pennsylvania courts have, however, consistently applied another section of the Restatement—Section 187—in determining the validity of a choice of law clause in an insurance policy. See, e.g., Smith, 2009 WL 789900, at *7 (citing Restatement § 187(1) for the proposition that "[u]nder Pennsylvania choice of law rules, a choice of law provision in an insurance contract will be given effect"). Under Section 187(1), a choice of law clause is valid as to a certain issue to be decided "if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." The issues raised by the instant cross-motions for summary judgment—the proper interpretation of the Retroactive Date Provision, the consequences of a breach of the duty to defend, and whether the Retroactive Date Provision is an "exclusion" as to which Catlin, as the insurer, bears the burden of proof—are issues which the parties could have addressed directly in the Pollution Policy. Indeed, the Pollution Policy contains provisions regarding contract interpretation (the choice of law clause itself, Section XI.L.), the duty to defend ("Defense and Settlement," Section II), and exclusions to coverage ("Exclusions," Section V).

Even if the parties could not have addressed these issues directly in the Pollution Policy such that the choice of law clause cannot be held valid under Section 187(1), the choice of law clause is nevertheless valid under Restatement Section 187(2). See Synthes USA Sales, LLC v. Harrison, 83 A.3d 242, 252 (Pa. Super. Ct. 2013) (explaining that Pennsylvania courts evaluate whether a choice of law clause is valid under Section 187(2) where the court finds that Section 187(1) does not apply because the particular issue is not one that the parties could have resolved in their contract). Section 187(2) provides that a choice of law clause is valid "unless . . . the

---

govern them, but rather a business with at least one executive dedicated to risk management. (See Celestino Decl., ¶¶ 2-3.)

chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." Restatement § 187(2).

J.J. White and Sunoco contend that the parties and the Pollution Policy both lack a substantial relationship to New York. While the relationship may not be "substantial," there is a "reasonable basis for the parties' choice" of New York law such that the choice of law clause is valid under Section 187(2). While J.J. White and Catlin were incorporated and had their primary place of business in different states—Catlin in Delaware and J.J. White in Pennsylvania—both did business in New York: J.J. White disclosed to Catlin in its application for coverage under the Pollution Policy that 1% of its work was located in New York, which business presumably was covered by the Pollution Policy. And Catlin maintained—at least as of the time that J.J. White tendered the Gans Suit to Catlin for defense—"significant underwriting and claims-handling operations in New York." (J.J. White/Sunoco's SOF ¶¶ 1, 4; Catlin's Resp. to J.J. White/Sunoco's SOF ¶¶ 1, 4; J.J. White/Sunoco's Am. Answer, Ex. B, Doc. No. 36-2 at 2.)

Accordingly, the parties' choice of New York law to apply to the Pollution Policy is valid and will be given effect.

## 2. Scope of the Choice of Law Clause

Having determined that the choice of law clause is valid, I must determine whether the issues to be decided in the instant cross-motions for summary judgment are within its scope. J.J. White and Sunoco argue that the choice of law clause applies only to the "interpretation" of the Pollution Policy, not to other substantive issues such as the consequence of a breach of the duty to defend or whether the retroactive date is an "exclusion" as to which Catlin bears the burden of proof. In advancing this argument, J.J. White and Sunoco point to the choice of law clause's use of the phrase "*subject [to] interpretation* under the law of the State of New York." J.J. White and

Sunoco's position appears to be that if the parties to the Pollution Policy intended other aspects of New York's substantive law to apply, the parties would have phrased the choice of law clause differently—by, for example, providing that the Pollution Policy "shall be *governed by* the law of the State of New York."

One commentator has recently summarized this argument, and how courts have addressed it:

> The typical choice-of-law clause comes in one of two varieties. The first states that a contract shall be "interpreted" or "construed" in accordance with the law of a particular state. The second provides that an agreement shall be "governed" by the law of that state. In principle, this linguistic variation could be important. If the court were to conclude that the act of interpreting a contract was fundamentally different from the act of determining the rights and obligations of the parties under the contract, for example, then the parties' choice of words could matter a great deal. In practice, however, most courts have recognized the formulations set forth above are essentially interchangeable. This is the canon of linguistic equivalence. This canon posits that it is unlikely that the parties would want to choose the law of one state to interpret their agreement and the law of another state to determine the scope of their rights and obligations under that same agreement. Accordingly, the canon holds that each of the words "interpreted" and "construed" and "governed" is the functional equivalent of the other two in the context of a choice-of-law clause.

John F. Coyle, <u>The Canons of Construction for Choice-of-Law Clauses</u>, 92 Wash. L. Rev. 631, 656 (2017) (collecting cases discussing how choice of law clauses using the phrase "shall be subject to interpretation under," or the like, have been construed by courts).

While it does not appear that New York courts have addressed the principle embodied in the canon of linguistic equivalence, I conclude that the New York Court of Appeals would likely apply it to the Pollution Policy's choice of law clause. New York courts have consistently held that "a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." <u>Cole v. Macklowe</u>, 953 N.Y.S.2d 21 (N.Y. App. Div. 2012); <u>see also</u> <u>Reape v. N.Y. News, Inc.</u>, 504 N.Y.S.2d 469, 470 (N.Y. App. Div. 1986) ("Since the intent of the parties entering an agreement is a paramount

consideration when construing a contract, even the actual words provided therein may be transplanted, supplied or entirely rejected to clarify the meaning of the contract.") (citing Castellano v. State, 374 N.E.2d 618, 620 (N.Y. 1978)). As Professor Coyle notes, there is little reason to believe that parties to a contract would ever intend to select one state's law to provide the principles of contract "interpretation" and another state's law to otherwise govern the contract. 92 Wash. L. Rev. at 660.

Applying the canon of linguistic equivalence to the Pollution Policy's choice of law clause, I conclude that New York's substantive contract and insurance law govern the Pollution Policy. Accordingly, except where otherwise noted, I will apply New York law to the substantive issues raised by the parties' cross-motions for summary judgment.

### B. *The Meaning of the Retroactive Date Provision*

At the heart of the parties' cross-motions for summary judgment is their dispute over the correct interpretation of the Pollution Policy's Retroactive Date Provision. Once again, the Pollution Policy's relevant coverage provision, Coverage C, reads, in relevant part, as follows (with defined terms in bold, and the Retroactive Date Provision in italics):

> The **Insurer** shall pay on behalf of **Insured** for a **Pollution Loss**[5] . . . which the **Insured** has or will become legally obligated to pay as a result [of] a **Pollution Claim**[6] . . . from **Pollution Conditions** . . . , *provided that . . . the* **Pollution Conditions** *first occurred on or after the* **Retroactive Date** . . . .

---

[5] "Pollution Loss" is defined, in relevant part, as "the amount the Named Insured is legally obligated to pay under law, from a Pollution Condition following the judgment of a Court . . . . Such Pollution Loss must result from a Pollution Condition arising from a Contractor Activity otherwise insured herein." (Pollution Policy, § IV.R.)

[6] "Pollution Claim" is defined, in relevant part, as "the assertion of a legal right alleging liability or responsibility on the part of the Insured, arising out of Pollution Conditions, and shall include but not necessarily be limited to lawsuits . . . filed against the Insured." (Pollution Policy, § IV.P.)

And again, the Pollution Policy defines the term "Pollution Condition" (singular) as (in relevant part): "the discharge, dispersal, release, seepage, migration or escape of . . . toxic chemicals [etc.] . . . into or upon land, the atmosphere or any watercourse or body of water."

Catlin argues that the Retroactive Date Provision precludes coverage for the Gans Suit because there is no genuine dispute that Gans was first exposed[7] to BTEX in Sunoco's refineries before the retroactive date, April 30, 2002. Thus, Catlin contends, the Retroactive Date Provision precludes coverage because the "Pollution Conditions" alleged in the Gans Suit—Gans' exposure to BTEX—"first occurred" before the retroactive date.

J.J. White and Sunoco assert that the mere fact that Gans was exposed to BTEX before the retroactive date is insufficient to preclude coverage. Rather, they argue, the Retroactive Date Provision only precludes coverage if Gans' pre-retroactive-date exposures to BTEX caused his leukemia. According to J.J. White and Sunoco, this is so because: (1) the Retroactive Date Provision's use of the term "*the* Pollution Conditions" refers to those Pollution Conditions (i.e., exposures to BTEX) described earlier in Coverage C; and (2) Coverage C's use of the terms "as a result [of]" and "from" indicate that the Pollution Conditions described therein are those that *caused* the "Pollution Loss."

For the reasons that follow, I conclude that J.J. White and Sunoco's reading of the Retroactive Date Provision is correct.

"The initial interpretation of a contract is a matter of law for the court to decide." Morgan Stanley Grp. Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks omitted) (applying New York law). Under New York law, a court must interpret an

---

[7] The parties appear to agree that any event in which Gans was "exposed" to BTEX—that is, came into direct contact with the chemical, whether by dermal contact with liquids or by inhalation of gas—constitutes a "Pollution Condition." The definition of "Pollution Condition" makes clear that the mere presence of a toxic chemical within a pipe or other closed container, without any escape of that chemical from that container into the air or onto a person, is not a "Pollution Condition."

insurance policy "to give effect to the intent of the parties as expressed in the clear language of the [policy]." <u>Id.</u> However, the terms of an insurance contract are ambiguous where they "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the content of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." <u>Id.</u> If an ambiguity exists, a court may "accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." <u>Id.</u> (internal quotation marks and citations omitted). And if "extrinsic evidence does not yield a conclusive answer about the parties' intent, a court may apply other rules of contract construction," including the rule that "any ambiguity in [an insurance] policy should be resolved in favor of the insured." <u>Id.</u> (internal quotation marks and citations omitted).

Here, the Retroactive Date Provision is unambiguous, because when it is "viewed objectively by a reasonably intelligent person," in the context of the other language in Coverage C, the provision is only susceptible to one interpretation: that the Retroactive Date Provision applies to bar coverage for a Pollution Loss only when that loss was caused by pre-retroactive-date Pollution Conditions.

Two points about the text of Coverage C suffice to make this interpretation clear. First, the Retroactive Date Provision uses the word "the" to refer to specific Pollution Conditions— providing that there is only coverage if "*the* Pollution Conditions first occurred on or after the retroactive date." Thus, the existence of *any* Pollution Conditions does not trigger the Retroactive Date Provision, only *the* Pollution Conditions described earlier in Coverage C.

Second, "*the* Pollution Conditions" described earlier in Coverage C are those Pollution Conditions that ultimately caused the loss—not any Pollution Conditions alleged in the

underlying lawsuit regardless of whether those Pollution Conditions are ultimately determined by the factfinder to be the cause of the loss. This is clear because Coverage C provides coverage for a "Pollution Loss . . . which the insured has or will become obligated to pay *as a result [of]* a Pollution Claim . . . *from* Pollution Conditions." The use of the terms "as a result of" and "from"—both of which denote causation—make clear that "*the* Pollution Conditions" are the Pollution Conditions that caused the loss. Cf., e.g., Burrage v. United States, 134 S. Ct. 881, 887 (2014) (holding that use of the phrase "[r]esults from" in a statute "imposes . . . a requirement of actual causality").

While these textual points alone suffice to establish that the Retroactive Date Provision unambiguously requires the interpretation urged by J.J. White and Sunoco, it is worth noting that the interpretation set out above is consistent with J.J. White's reasonable expectations in choosing April 30, 2002, as the retroactive date. See e.g., McCarthy v. Am. Int'l Grp, Inc., 283 F.3d 121, 124 (2d Cir. 2002) (applying New York law and noting that "ambiguous language should be construed in accordance with the reasonable expectations of the insured when [it] entered into the contract"). J.J. White chose this date in order to avoid any gap or overlap in coverage between its final "occurrence-based" policy, which expired as of that date, and its first "claims-made" policy, which began on that date. (See J.J. White/Sunoco's SOF ¶ 36; Catlin's Resp. to J.J. White/Sunoco's SOF ¶ 36.)[8] Thus, J.J. White reasonably expected that any loss caused by Pollution Conditions would be covered by one (and only one) of these two policies. Losses caused by pre-retroactive-date Pollution Conditions would be covered by the occurrence-

---

[8] In its Response to J.J. White and Sunoco's Statement of Facts on this point (Paragraph 36), Catlin did not cite to any evidence in the record to the contrary, but merely noted that it "denies knowledge or information sufficient to form a belief as to the truth of the allegations." At summary judgment, that is insufficient to create a genuine dispute of material fact. See, e.g., Savage v. Judge, 644 F. Supp. 2d 550, 561 (E.D. Pa. 2009) ("It is well-settled that a party opposing a motion for summary judgment must point to specific, affirmative evidence in the record and not simply rely on . . . denials." (internal quotation marks omitted)).

based policy; and any other loss from Pollution Conditions would be covered by its Pollution Policy with Catlin.

By contrast, the interpretation urged by Catlin would confound these reasonable expectations. As Catlin apparently concedes, under its interpretation of the Pollution Policy, the Retroactive Date Provision would preclude coverage even if Gans had been exposed to a miniscule, indisputably non-harmful amount of BTEX before the retroactive date, followed by a large, clearly harmful amount of BTEX after the retroactive date. (See Catlin's Br. in Opp'n to J.J. White/Sunoco's Mot. 4 (noting that "the definition of Pollution Condition 'is very broad' and encompasses a scenario where 'prior to 2002, . . . Gans, on a single occasion, had been exposed to even a few drops of or inhaled a couple of breaths that had minute amounts of benzene.'")) Thus, under Catlin's interpretation, even if Gans' leukemia was entirely caused by BTEX exposure occurring after the retroactive date—and therefore not covered by J.J. White's previous occurrence-based policy—the loss would still not be covered under the Pollution Policy, if Gans had been exposed to any amount of BTEX before the retroactive date. Such a scenario would result in no coverage under either J.J. White's previous occurrence-based policy or the Pollution Policy with Catlin. J.J. White could not reasonably have expected such a result.

Catlin argues that its interpretation of the Retroactive Date Provision is consistent with two cases in which courts have applied a retroactive date provision to bar coverage for an insured's pollution-related loss. (See Catlin's Br. in Opp'n to J.J. White/Sunoco's Mot. 9; Catlin's Reply Br. 6 n.9 (citing Am. Int'l Specialty Lines v. Kagor Realty Co., LLC ("Kagor Realty"), 5 N.Y.S.3d 32, 33 (N.Y. App. Div. 2015), aff'g No. 1021542011, 2013 WL 11267027, at *1 (N.Y. Sup. Ct. Jan. 3, 2013); Pritchard v. Federated Mut. Ins. Co., No. 93-2765, 1995 WL 854775, at *2-3 (W.D. Tenn. Oct. 2, 1995)) Catlin urges that these two cases illustrate that it is

not necessary, in order for a retroactive date provision to apply, that the pre-retroactive-date pollution conditions caused the loss.

In Kagor Realty, an insurer sought a declaration that it was not obligated to defend its insured, a property owner that had been sued by the guardian of an infant that suffered injury from ingesting paint chips on the property. 5 N.Y.S.3d at 33. Like the Pollution Policy here, the policy in Kagor Realty contained a retroactive date provision, providing that, in order for there to be coverage, "the Pollution Conditions must commence on or after the [retroactive] date," June 9, 1996. 2013 WL 11267027, at *1.

In granting summary judgment to the insurer, the trial court in Kagor Realty looked to the record in the underlying lawsuit, noting that uncontroverted deposition testimony established that "the pollution conditions commenced before [the retroactive date]." 2013 WL 11267027, at *2. Specifically, the trial court noted that the infant "was eating paint chips from November 1993 through November 1994 or November 1995." Id. at *1. And the appellate court affirmed, noting that "the record amply demonstrate[d] that the lead paint pollution conditions that were alleged to have caused the infant plaintiff's bodily injuries commenced prior to the June 9, 1996 retroactive date." 5 N.Y.S.3d at 33.

Unlike the loss at issue here (Gans' leukemia), in Kagor Realty it was beyond dispute that the loss was caused by pre-retroactive date pollution conditions. Therefore, Kagor Realty does not support Catlin's position here, where it is disputed whether pre- or post-retroactive-date exposures to BTEX caused Gans' leukemia.

Likewise, in Pritchard an insurer argued that there was no coverage for a loss caused by a leak of a gas station's underground tanks, citing the policy's retroactive date provision. The court agreed, noting that the insured had produced no evidence "showing there was a discharge or

release of pollutants that commenced on or after [the retroactive date set out in the policy]." 1995 WL 854775, at *11. Like Kagor Realty, Pritchard does not support Catlin's position, because there was no evidence in that case that *any* pollution conditions occurred on or after the retroactive date; all such conditions occurred before that date.

In sum, the text of Coverage C unambiguously establishes that the Retroactive Date Provision only precludes coverage if the loss was caused by Pollution Conditions that occurred before the retroactive date. And even if the text of Coverage C were ambiguous on this point, this interpretation is supported by the undisputed evidence of J.J. White's reasonable expectations as the insured. Accordingly, I will evaluate the parties' claims in light of this interpretation of the Pollution Policy.

### C. *Breach of the Duty to Defend*

Having determined that the Retroactive Date Provision precludes coverage for the Gans Suit only if pre-retroactive date Pollution Conditions caused Gans' leukemia, I must next determine whether J.J. White and Sunoco are entitled to summary judgment on their claim that Catlin breached its duty to defend.

Under New York law, "the duty of an insurer to defend its insured arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim. If any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action." Barkan v. N.Y. Schs. Ins. Reciprocal, 886 N.Y.S.2d 414, 417 (N.Y. App. Div. 2009). But even where the underlying complaint meets this test, "an insurer can [subsequently] be relieved of its duty to defend if it establishes as a matter of law that there

is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured." <u>Allstate Ins. Co. v. Zuk</u>, 574 N.E.2d 1035, 1037 (N.Y. 1991).[9]

At the outset of the Gans Suit, Catlin had a duty to defend, as the complaint did not exclude the possibility of coverage: it alleged only that Gans was exposed before May 1, 2010. Catlin's duty to defend continued until it could establish "as a matter of law that there [was] no possible factual or legal basis on which it might eventually be obligated to indemnify." <u>Allstate Ins. Co.</u>, 574 N.E.2d at 1037. Because, as discussed above, the Retroactive Date Provision precludes coverage for a loss only if the loss was caused by pre-retroactive-date Pollution Conditions, Catlin was obligated to defend the Gans Suit until it could establish as a matter of law that, to the extent Gans' leukemia was caused by exposure to BTEX, it was caused by BTEX exposures that occurred before the retroactive date, April 30, 2002.

I conclude, as a matter of law, that Catlin breached its duty to defend because it could not, and did not, establish this fact at the time it withdrew its defense and disclaimed coverage— February 27, 2014. Rather, at this point in the Gans Suit, discovery was still ongoing, and the record established a genuine dispute as to whether *any* exposure to BTEX—before or after the retroactive date—was the cause of Gans' leukemia. And as J.J. White and Sunoco point out, Catlin was aware that this point was disputed in the litigation. (J.J. White/Sunoco's SOF ¶ 96; Catlin's Resp. to J.J. White/Sunoco's SOF ¶ 96.)

Indeed, J.J. White and Sunoco's position in the Gans Suit was supported by expert reports that were produced in discovery. In those reports, defense experts opined that the cause of Gans' leukemia was likely idiopathic or based on his family history of cancer or years of

---

[9] The language of the Pollution Policy is consistent with this statement of the duty to defend. (<u>See</u> Pollution Policy, § II ("The **Insurer** shall have the right and duty to defend any . . . **Pollution Claim** made against the Insured seeking sums payable under this Policy, even if the allegations of the **Pollution Claim** are groundless or false."))

cigarette smoking. For example, one of the defense experts, David Pyatt, opined that "Gans' occupational exposure to benzene was not a causative factor in the development of his [leukemia]," and that "the pathological characteristics of . . . Gans' [leukemia] are consistent with a *de novo* or idiopathic etiology and do not provide support for the opinion that his disease was related to any occupational exposures he may have experienced." (Celestino Decl., Ex. K, Doc. No. 108-16 at 18-19.)

Dr. Pyatt further opined that "the most important benzene exposures with regard to [leukemia] risk are those that occur within 10-15 years prior to diagnosis (etiological window)" and that "[e]xposures more distant than 10-15 years have little or no influence on [leukemia] risk." (Celestino Decl., Ex. K, Doc. No. 108-16 at 4.)[10] Thus, Dr. Pyatt's opinion not only lends support to the defense's position in the Gans Suit—that *none* of the alleged BTEX exposures caused Gans' leukemia—it illustrates how a factfinder could have concluded that Gans' leukemia was the result of BTEX exposures occurring *after* the retroactive date. If Dr. Pyatt's opinion that BTEX exposures occurring more than 10-15 years before a person develops leukemia cannot be the cause of the leukemia is accepted, a factfinder could conclude that Gans' exposures to BTEX occurring before the retroactive date—eight years before Gans' diagnosis in 2010—did not cause Gans' leukemia.

In addition to setting out their own opinions as to the cause of Gans' leukemia, the defense experts criticized the estate's experts for relying on the statements of Gans' coworkers, who later testified in depositions about Gans' exposure to BTEX as early as the 1980s. For example, Gans' coworkers testified generally to smelling benzene at certain times that they were with Gans. One of Sunoco's experts, John W. Spencer, opined that statements that a person

---

[10] Another Sunoco expert, David Garabrant, concurred, opining that "[b]enzene exposures that occurred more than 15 years prior to the diagnosis of [leukemia] play little or no etiological role in the causation of the disease regardless of the cumulative exposure." (Celestino Decl., Ex. L, Doc. No. 108-17 at 10-11.)

smelled benzene at certain times cannot reliably establish a concentration of benzene that was inhaled. (Celestino Decl., Ex. J, Doc,. No. 108-15 at 11). Gans' coworkers also testified generally that they saw Gans get splashed with liquids that they believed contained BTEX and saw Gans clean his tools and skin with such liquids. Sunoco's expert, Dr. Spencer, opined that there is no accepted methodology for measuring the harm of dermal exposure—as opposed to inhalation—of benzene. (Id. at 13.)

Sunoco was prepared, in the event the Gans Suit went to trial, to attack the coworkers' testimony in other ways as well. For example, Sunoco pointed to the fact that Gans did not file any incident reports relating to any spill or other exposure to BTEX. Sunoco also contends that it collected thousands of air samples in the years between 1987 through 2007, but none showed that Gans was present in the areas where such samples were taken. (See J.J. White/Sunoco's SOF ¶ 84; Catlin's Resp. to J. White/Sunoco's SOF ¶ 84.)

In sum, had the Gans Suit proceeded to trial, the finder of fact may well have found that Gans was exposed to BTEX in substantial amounts before the retroactive date, and that this exposure caused Gans' leukemia, precluding coverage under the Pollution Policy. Conversely, a factfinder could also have reasonably found that Gans was exposed to BTEX in substantial amounts *after* the retroactive date, and that it was this later exposure that caused his leukemia— in which case there would be coverage under the Pollution Policy. But under either scenario, Catlin cannot establish here, as a matter of law, that at the time it withdrew its defense there was no possible factual or legal basis on which it might eventually be obligated to cover a loss in the Gans Suit. Thus, Catlin was not relieved of its duty to defend.

Catlin finally argues, in a single paragraph of its Brief in Opposition to J.J. White and Sunoco's Motion for Summary Judgment, that it did not have a duty to defend the Gans Suit because neither J.J. White nor Sunoco had paid the $250,000 "Self-Insurance Retention" ("SIR") required by the Pollution Policy. The Pollution Policy's "Self-Insurance Retention Amendatory Endorsement" provides, in relevant part, that "the [SIR] amount [$250,000] . . . is applicable to each claim and applies to the payment of . . . Pollution Claims, including Claim Expense," and that "[t]he [SIR] amount shall be paid by the Named Insured and [the Named Insured] shall be uninsured and remain uninsured during the Policy Period" until the SIR is paid. (Ford Decl., Ex. A., Doc. No. 71-1 at 38.)

But even if the SIR Provision in the Pollution Policy requires J.J. White to pay the first $250,000 in defense costs, and excuses Catlin from any duty to defend until such costs are paid, Catlin cannot raise this defense now, as it never refused to defend the Gans Suit on this ground. Rather, Catlin assumed the defense of the Gans Suit—subject only to its reservation of rights regarding coverage in light of the Retroactive Date Provision—notwithstanding any failure by J.J. White or Sunoco to pay the SIR amount. Thus, even if the Pollution Policy excused Catlin from its obligation to defend until J.J. White paid $250,000 in defense costs, Catlin is equitably estopped from raising the SIR Provision here. Cf., e.g., City of Utica, N.Y. v. Genesee Mgmt., Inc., 934 F. Supp. 510, 523 (N.D.N.Y. 1996) (applying New York law and holding that an insurer was equitably estopped from asserting a defense under an insurance policy where the insurer had not timely notified its insured of the defense, prejudicing the insured). The prejudice to J.J. White and Sunoco caused by Catlin's failure to raise this defense earlier is obvious: if Catlin had raised the SIR Provision when J.J. White and Sunoco first sought a defense from Catlin, they could have paid the SIR amount; it cannot now, except as a deduction from any

amount that they may recover from Catlin, which, as J.J. White concedes, may be required. (<u>See</u> J.J. White/Sunoco's Reply Br. 8 ("At most, the unexhausted portion of the SIR should be deducted from any recovery allocated to JJ White.")

In sum, Catlin breached its duty to defend when it withdrew its defense of the Gans Suit, before it could establish as a matter of law that Gans' leukemia was caused by pre-retroactive-date exposures to BTEX. Accordingly, I will grant J.J. White and Sunoco's Motion for Summary Judgment as to this issue.

**D.** ***Does Catlin's Breach of the Duty to Defend Preclude It From Now Disputing Coverage?***

Having determined that Catlin breached its duty to defend when it abandoned the defense of the Gans Suit, I must determine whether Catlin may still contend that it does not have a duty to indemnify J.J. White and Sunoco for the settlement that they subsequently agreed to with Gans' estate. J.J. White and Sunoco argue that Catlin cannot do so, because an insurer that breaches the duty to defend loses the ability to dispute coverage for a subsequent settlement, so long as that settlement is reasonable. Catlin responds that a breach of the duty to defend does not automatically give rise to a duty to indemnify the insured for a reasonable settlement, because the insured must still show that there was coverage for the loss.

Under New York law, Catlin is correct. <u>See</u> <u>Servidone Construction Corp. v. Sec. Ins. Co. of Hartford</u>, 477 N.E.2d 441, 442-445 (N.Y. 1985); <u>K2 Inv. Grp. v. Am. Guar. & Liab. Ins. Co.</u>, 6 N.E.3d 1117, 1119-1121 (N.Y. 2014) (reaffirming <u>Servidone</u>). In <u>Servidone</u>, the New York Court of Appeals squarely addressed this question, which it stated as follows: "Where an insurer breaches a contractual duty to defend its insured in a personal injury action, and the insured thereafter concludes a reasonable settlement with the injured party, is the insurer liable to indemnify the insured even if coverage is disputed?" 477 N.E.2d at 442. In answering this

question in the negative, the court noted that while "the duty to defend is measured against the allegations in the pleadings[,] . . . the duty to pay [i.e., indemnify] is determined by the actual basis for the insured's liability to a third person." <u>Id.</u> at 444. Thus, to "hold[] the insurer liable to indemnify on the mere 'possibility' of coverage perceived from the face of the complaint—the standard applicable to the duty to defend—the court [would] enlarge[] the bargained for coverage as a penalty for breach of the duty to defend, and this it cannot do." <u>Id.</u> at 444.

In support of their position, J.J. White and Sunoco cite to a section of a draft of the Restatement of the Law of Liability Insurance that provides that "an insurer that breaches the duty to defend without a reasonable basis for its conduct must provide coverage for the legal action for which the defense was sought, notwithstanding any grounds for contesting coverage." Restatement of the Law of Liability Insurance § 19 (Proposed Final Draft, Mar. 28, 2017). A comment to this section explains that this rule "encourages insurers to fulfill their duty to defend by providing a consequence for a wrongful breach of that duty," and that "[o]rdinary contract damages may not provide an adequate incentive for insurers to defend." <u>Id.</u> § 19, cmt. b. However, in a relatively recent decision, the New York Court of Appeals considered such policy concerns, but nevertheless declined to depart from the rule in <u>Servidone</u>. <u>K2 Inv. Grp. v. Am. Guar. & Liab. Ins. Co.</u>, 6 N.E.3d 1117, 1119-1121 (N.Y. 2014) (noting that while "there is much to be said" for a rule that an insurer that breaches the duty to defend is precluded from asserting coverage defenses, there is also "much to be said for the <u>Servidone</u> rule").

Because a breach of the duty to defend does not automatically establish a duty to indemnify a reasonable settlement, and because, as discussed above, the record in the Gans Suit demonstrates a genuine dispute as to whether the loss from the Gans Suit is covered by the

Pollution Policy, J.J. White and Sunoco's Motion for Summary Judgment will be denied as to this issue.

### E.   *Is the Retroactive Date Provision an "Exclusion," for Which Catlin, as the Insurer, Bears the Burden of Proof?*

Because I decline to grant J.J. White and Sunoco summary judgment on their claim that Catlin must indemnify them for their settlement with Gans' estate, I must address their alternative argument: that they are entitled to partial summary judgment as to whether Catlin bears the burden of proving that the Retroactive Date Provision is applicable—i.e. whether Gans' leukemia was caused by pre-retroactive-date exposures to BTEX. J.J. White and Sunoco argue that the Retroactive Date Provision is an "exclusion," which Catlin, as the insurer, bears the burden of proving applies. Catlin responds that the Retroactive Date Provision is not an exclusion, but rather defines the scope of the initial grant of coverage, such that J.J. White and Sunoco, as the insureds, bear the burden of proving that it is inapplicable.

As the parties agree, under the law of New York (and many, if not all, other jurisdictions), an insured bears the burden of proving whether a loss falls within the *initial grant of coverage*, while the insurer bears the burden of proving that an *exclusion* applies. See, e.g., Platek v. Town of Hamburg, 26 N.E.3d 688, 694 (N.Y. 2015) ("[A]lthough the insurer has the burden of proving the applicability of an exclusion, it is the insured's burden to establish the existence of coverage." (citations omitted)). The parties disagree, however, as to whether the Retroactive Date Provision is an exclusion or part of the initial grant of coverage. J.J. White and Sunoco argue that the Retroactive Date Provision is an exclusion, because it has the effect of excluding from coverage a loss that would otherwise be covered. Catlin argues that the Retroactive Date Provision is part of the initial grant of coverage because it defines when coverage begins, much like the effective period in an occurrence-based policy.

Federal courts applying New York law have noted that "determining whether there is no coverage by reason of exclusion as opposed to lack of inclusion can be problematic," because "*any* language providing coverage for certain events of necessity implicitly excludes other events." Atl. Cas. Ins. Co. v. Value Waterproofing, Inc., 918 F. Supp. 2d 243, 257 (S.D.N.Y. 2013) (internal quotation marks and citations omitted). Thus, "in distinguishing between exclusions and lack of coverage courts should consider whether the claimed loss was initially covered by the policy and only became uncovered upon the happening of a subsequent event, or whether it was never covered in the first place." Id. (quoting NGM Insur. Co. v. Blakely Pumping, Inc., 593 F.3d 150, 154 (2d Cir. 2013)).

While there do not appear to be any New York cases explicitly applying these principles in assessing whether a retroactive date provision is an exclusion or part of the initial grant of coverage, one recent New York appellate court decision supports Catlin's position on this issue. See Kagor Realty, 5 N.Y.S.3d at 33. As discussed above, in Kagor Realty the Appellate Division of the New York Supreme Court affirmed the trial court's granting of summary judgment to an insurer, where the undisputed record showed that the policy's retroactive date provision applied to preclude coverage. In so holding, the court also held that the retroactive date provision was not an "exclusionary clause" but rather was part of the initial grant of coverage. Id. (noting that because the retroactive date provision was applicable, there was "no coverage under the policy . . . , as opposed to an operative exclusionary clause").[11]

---

[11] The court in Kagor Realty was faced with the question not because, like here, the insured had argued that the insurer bore the burden of proving the retroactive date provision's applicability. Rather, the court decided the question in the course of determining whether a New York insurance statute regarding certain notice requirements for policy exclusions (a statute not at issue in this case) was applicable. See Kagor Realty, 5 N.Y.S.2d at 573 (citing Insurance Law § 3420(d)). But the holding in Kagor Realty that a retroactive date provision is part of the initial grant of coverage, and not a policy exclusion, is no less applicable here.

And at least one court outside of New York has also held a retroactive date provision to be part of the initial grant of coverage, rather than an exclusion. See Pritchard, 1995 WL 854775, at *10 (noting that "under Tennessee law, . . . an insured has the burden of proving its claim falls within the terms of coverage," and thus "[the insured] has the burden of showing there was a pollution incident that commenced after the retroactive date").

While not long on reasoning, the holdings in Kagor Realty and Pritchard make sense in light of what a retroactive date provision does: provide an occurrence-based coverage period for a policy that would otherwise be purely claims-made. In the context of occurrence-based insurance policies, courts consistently hold that whether a claimed event occurred within the policy period is part of the initial grant of coverage. See, e.g., GCG Assocs. LP v. Am. Cas. Co. of Reading Pa., No. 07-cv-792, 2008 WL 3542620, at *5 (W.D. Wash. Aug. 8, 2008) (holding that the insured had the burden of proving "whether the loss or damage commenced during the policy period," because this was "not the subject of an exclusion"). Like a policy period in an occurrence-based policy, a retroactive date in a claims-made policy sets the period of time in which an event must occur to be covered.

Accordingly, I will deny J.J. White and Sunoco's alternative motion for partial summary judgment on the issue of the burden of proof. As part of the scope of coverage, rather than a policy exclusion, J.J. White and Sunoco, as insureds, bear the burden of proving that the Retroactive Date Provision is inapplicable—i.e., that Gans' leukemia was caused by exposures to BTEX occurring on or after the retroactive date.

## F. *Is Sunoco an Additional Insured on the Pollution Policy?*

Finally, Sunoco moves for summary judgment on its claim that it is an additional insured under the Pollution Policy, pursuant to a provision of the Pollution Policy that provides coverage to "any client of [J.J. White] that [J.J. White] has agreed by written contract to name as an additional insured on [the Pollution] Policy." Sunoco argues that the Field Services Contracts—in which J.J. White and Sunoco agreed that J.J. White would obtain certain insurance policies and name Sunoco as an additional insured on those policies—satisfy this provision of the Pollution Policy.

The meaning of this provision of the Pollution Policy is unambiguous: if J.J. White enters into a written contract with an entity, and that contract requires J.J. White to name the entity as an additional insured in the Pollution Policy, that entity is an additional insured.[12] Thus, in order to determine whether Sunoco is an additional insured under the Pollution Policy, I must interpret the Field Services Contracts to determine whether J.J. White has agreed in those contracts to name Sunoco as an additional insured.[13]

The insurance provisions of the two Field Services Contracts in the record (executed in 2003 and 2009) vary slightly, but both provide that J.J. White must maintain insurance "for the respective items:" (1) "Statutory Worker's Compensation and Occupational Disease Insurance"; (2) "Commercial Liability Insurance" and (3) "Automobile Liability Insurance." (See Celestino

---

[12] Catlin appears to argue that the Pollution Policy's use of the term "written contract" means that a contract must *explicitly* require J.J. White to name the entity as an additional insured on the Pollution Policy, and, therefore, no extrinsic evidence may be used to interpret the Field Services Contracts. I disagree. The provision simply requires that there must be some written contract under which J.J. White has agreed to provide coverage; in other words, while the Pollution Policy is not satisfied by a mere verbal contract between J.J. White and the entity, the Pollution Policy does not preclude the use of extrinsic evidence where appropriate to interpret a written contract.

[13] Because both the 2003 and 2009 Field Services Contracts contain a choice of law clause providing that they should be "construed in accordance with" or "governed by" Pennsylvania law (see Celestino Decl., Ex. F., Doc. No. 108-10 at 14, ¶ 21; Id., Doc. No. 108-11 at 20, Art. 8), I will apply Pennsylvania law when interpreting them.

Decl., Ex. F., Doc. No. 108-10 at 11, ¶ 14; Id., Doc. No. 108-11 at 24, ¶ 25.) J.J. White and Sunoco argue that, while neither the Pollution Policy specifically, nor pollution coverage generally, is listed among these three types of insurance policies, pollution coverage is nevertheless included, in light of J.J. White and Sunoco's mutual understanding that such coverage was included.

"Where the parties [to a contract] have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." Finkle Distributors, Inc. v. Herzog, No. 141 WDA 2015, 2016 WL 907031, at *3 (Pa. Super. Ct. Mar. 9, 2016) (quoting Restatement (Second) of Contracts § 201(1) (1981)). "The construction placed upon a contract by the parties themselves is worthy of great consideration and generally will be adopted, particularly when such construction is made prior to the occurrence of any controversy or litigation[.]" Id. at *3 (citing Denharter v. First Fed. Sav. & Loan Ass'n of Pittsburgh, 194 A.2d 214, 220 (Pa. 1963)).

J.J. White and Sunoco have provided evidence—which remains undisputed by Catlin— that they understood, years before Gans' estate asserted a claim, that the Field Services Contracts required J.J. White to obtain pollution coverage and to name Sunoco as an additional insured on that coverage. Specifically, two undisputed facts support the existence of such an understanding: (1) the fact that J.J. White originally obtained its pollution coverage through its general commercial liability policy, and that general commercial liability insurance is one of the types of insurance specified in the Field Services Contracts; and (2) the fact that J.J. White communicated to Sunoco that it was passing along the costs of obtaining pollution coverage in the labor rates it charged Sunoco.

As to Sunoco's first point, one of the types of insurance that the Field Services Contracts required J.J. White to obtain is "Commercial Liability Insurance." As J.J. White and Sunoco note, in the early 2000s, insurers were beginning to exclude pollution coverage from general commercial liability policies, prompting J.J. White to secure a standalone pollution policy effective April 30, 2002. (J.J. White/Sunoco's SOF ¶¶ 28-30; Catlin's Resp. to J.J. White/Sunoco's SOF ¶¶ 28-30.)[14] This supports J.J. White and Sunoco's contention that they understood that the Field Services Contracts would continue to require pollution coverage as part of the "Commercial Liability Insurance" that was explicitly required.

Second, J.J. White and Sunoco's understanding is supported by communications from J.J. White to Sunoco explaining how the labor rates J.J. White was charging Sunoco included the costs of obtaining pollution coverage. For example, in a July 5, 2002, fax from J.J. White's risk manager, Robert Celestino, to one of Sunoco's insurance coordinators, Regina Stover-Burns, Celestino provided a breakdown of the insurance coverages the costs of which J.J. White was passing on to Sunoco in its labor rates. Included in this breakdown was a category of coverage entitled "Other," which Celestino noted in this fax was composed of several forms of coverage including "Pollution (Occurrence & Sudden or Accidental)." This communication supports J.J. White and Sunoco's position that they understood pollution coverage to be one of the coverages that J.J. White was required to obtain, and name Sunoco as an additional insured on, under the Field Services Contracts. (J.J. White/Sunoco's SOF ¶¶ 50-56; Catlin's Resp. to J.J. White/Sunoco's SOF ¶¶ 50-56.)

---

[14] Catlin responds to J.J. White and Sunoco's Statement of Facts on this point only by stating that it "denies knowledge or information sufficient to form a belief as to the truth of the allegations." As noted in Footnote 8, above, a mere denial is insufficient to place this point in genuine dispute.

Because the undisputed record establishes that J.J. White and Sunoco mutually understood the Field Services Contracts to require J.J. White to obtain pollution coverage and to include Sunoco as an additional insured in that coverage, Sunoco is an additional insured on the Pollution Policy. Accordingly, I will grant J.J. White and Sunoco's Motion for Summary Judgment as to this issue.

## IV. <u>CONCLUSION</u>

For the reasons set out above, Catlin's Motion for Summary Judgment on its declaratory judgment claim will be denied. J.J. White and Sunoco's Motion for Summary Judgment will be granted as to: (1) J.J. White and Sunoco's claim that Catlin breached its duty to defend them; and (2) Sunoco's claim that it is an additional insured on the Pollution Policy. In all other respects, J.J. White and Sunoco's Motion will be denied.

An appropriate Order follows.